NUMBER 13-08-00218-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


BEVERLY ST. CLAIR, Appellant,


v.


MATTHEW T. ALEXANDER, M.D. 

AND NEUROSURGERY INSTITUTE 

OF SOUTH TEXAS, P.A., Appellees.

 




On appeal from the 105th District Court of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Rodriguez and Benavides


Memorandum Opinion by Chief Justice Valdez



 In this medical malpractice case, appellant, Beverly St. Clair, argues that the trial
court erred in sustaining objections to exclude the testimony of her expert witness, and
subsequently granting summary judgment for appellees, Matthew T. Alexander, M.D., and
Neurosurgery Institute of South Texas, P.A. (collectively referred to as "Alexander"). In
three issues, St. Clair contends that: (1) the trial court erred by considering evidence
attached by Alexander to his no-evidence motion for summary judgment; (2) this error
affects the standard of review under which we should review the no-evidence summary
judgment; and (3) Alexander did not properly challenge St. Clair's expert testimony
because Alexander focused on the expert's conclusions rather than offering contrary
evidence to disprove the expert's methodology. We reverse and remand.

I. Background


 In 2004, St. Clair was diagnosed with spinal stenosis, a degenerative narrowing of
the spinal canal. Alexander performed an L2 inferior to S1 superior decompressive
laminectomy to relieve pressure on the nerves inside St. Clair's spinal cord. After surgery,
St. Clair developed cauda equina syndrome, a disorder affecting the bundle of nerve roots
at the lower end of the spinal cord. As a result, St. Clair now suffers from bowel and
bladder dysfunction, sexual dysfunction, and diminished ability to use her left leg.

 On August 14, 2006, St. Clair brought medical negligence claims against Alexander. 
Alexander subsequently filed a motion for summary judgment. The motion raised
no-evidence points, as well as a Daubert-Robinson challenge contesting the qualifications
and reliability of St. Clair's expert testimony. See Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579, 590 (1993); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549,
558 (Tex. 1995). Alexander attached excerpts of the deposition of St. Clair's expert, J.
Martin Barrash, M.D., to the motion. St. Clair filed a response and attached an affidavit by
Barrash, as well as excerpts from his deposition. (1) 

 Alexander filed objections asserting that Barrash's testimony regarding the breach
of the standard of care and causation did not meet the requirements of rule 702 of the
Texas Rules of Evidence. (2) Alexander did not attach any evidence to his objections;
instead, he referred to the excerpts he had attached to his no-evidence motion for
summary judgment. Neither party requested a Daubert-Robinson hearing.

 At the hearing on Alexander's no-evidence motion for summary judgment,
Alexander informed the court that this was a "sort of combination motion[ ]" because it
involved both a motion for summary judgment and a challenge to St. Clair's expert witness. 
The trial court sustained Alexander's objections to Barrash's testimony and granted
Alexander's no-evidence motion for summary judgment.

II. Alexander's Objections


 By sustaining Alexander's objections, the trial court effectively found that Barrash's
testimony was not admissible for summary judgment purposes. In her third issue, St. Clair
contends that Alexander did not properly challenge Barrash's testimony because
Alexander did not offer contrary evidence disproving Barrash's methodology. Specifically,
St. Clair argues that the trial court violated rule 702 by sustaining Alexander's objections. 
Based on St. Clair's underlying arguments, we construe her third issue as asserting that
the trial court abused its discretion by sustaining Alexander's objections and excluding
Barrash's testimony. 

A. Standard of Review

 Whether the trial court properly excluded expert testimony is subject to an abuse
of discretion standard of review. See Robinson, 923 S.W2d at 558. The trial court abuses
its discretion when its decision is arbitrary, unreasonable, or without regard to guiding rules
and principles. Larson v. Downing, 197 S.W.3d 303, 304-05 (Tex. 2006); Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). 

B. Applicable Law

 The trial court sustained Alexander's objections that Barrash's testimony regarding
the breach of the standard of care and causation was not admissible because it did not
meet the requirements of rule 702. See Tex. R. Evid. 702. Expert testimony is admissible
if: (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable
foundation. Robinson, 923 S.W.2d at 556. It is the obligation of the trial court to act as
"gatekeeper" to ensure relevance and reliability of expert testimony. Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 722-26 (Tex. 1998). Once the party opposing
expert testimony objects, the proponent bears the burden to demonstrate admissibility. 
Robinson, 923 S.W.2d at 557. 

C. Analysis

 St. Clair argues that the trial court violated chapter 74 of the Texas Civil Practices
and Remedies Code, as well as the Daubert-Robinson standard of review. In his
objections to Barrash's testimony, Alexander did not challenge Barrash's testimony on the
basis that it was irrelevant. Instead, Alexander only asserted that Barrash was unqualified
to offer standard-of-care testimony and that his opinions regarding the standard of care
and causation were not reliable. 

 1. Barrash is a Qualified Expert

 Section 74.402 of the Texas Civil Practice and Remedies Code provides that:

(b) In a suit involving a health care liability claim against a health care
provider, a person may qualify as an expert witness on the issue of whether
the health care provider departed from accepted standards of care only if the
person:


 (1) is practicing health care in a field of practice that involves the
same type of care or treatment as that delivered by the defendant
health care provider, if the defendant health care provider is an
individual, at the time the testimony is given or was practicing that
type of health care at the time the claim arose;


 (2) has knowledge of accepted standards of care for health care
providers for the diagnosis, care, or treatment of the illness, injury, or
condition involved in the claim; and 


 (3) is qualified on the basis of training or experience to offer an expert
opinion regarding those accepted standards of health care.


Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b) (Vernon 2005). 

 Barrash graduated from the University of Maryland School of Medicine in 1966. 
After completing his degree, he interned for one year at Mercy Hospital in Baltimore,
Maryland. In 1968, he began residency training in general surgery. After completing his
general surgery residency, he completed a residency in neurological surgery in 1972 at
Baylor College of Medicine. Following his residency, Barrash began his own practice,
which he still maintains. In 1974, he became board certified in Neurosurgery. He is
currently a member of the American Association of Neurological Surgeons, the Congress
of Neurological Surgeons, the Texas Association of Neurological Surgeons, and the
Houston Neurological Society.

 At the time of St. Clair's surgery, Barrash was no longer able to perform
laminectomies as a lead surgeon due to an injury sustained in his right arm. However, in
his affidavit, Barrash states that despite his injury, he currently assists in laminectomies
preoperatively, operatively, and postoperatively. Further, Barrash states, "I continue to
assist in laminectomies to the present day and actively see patients who have undergone
a laminectomy procedure on an almost daily basis." 

 Alexander argues that the trial court did not abuse its discretion in finding Barrash
unqualified because Barrash does not meet the requirements of subsection (b)(1). 
Specifically, Alexander argues, "insofar as Barrash is no longer lead surgeon on the type
of surgeries involved in this case, he is no longer practicing the type of health care being
rendered by Alexander at the time of his treatment of Ms. St. Clair . . . ." Alexander
supports this argument by emphasizing that "for the past ten years [Barrash] has just been
a second opinion doctor," as opposed to a "lead surgeon." 

 In Larson v. Downing, the Texas Supreme Court concluded that the trial court
properly excluded the testimony of the plaintiff's proffered expert where the expert had not
performed the surgery at issue for over eleven years, and there was no evidence that he
had ever taught the procedure. 197 S.W.3d at 305. The court noted that "[t]he trial court
was well within its discretion in determining that [the plaintiff's expert] was too far removed
from surgical procedures and even from teaching." Id. Unlike the proffered expert in
Larson, where no evidence was presented that the expert continued to participate in
surgery, Barrash continues to participate in lumbar laminectomy surgeries. Although
Barrash is presently unable to hold the title of "lead" surgeon, he is nevertheless a surgeon
who assists in laminectomies preoperatively, operatively, and postoperatively. Therefore,
at the time of St. Clair's surgery, Barrash was "practicing health care in a field of practice
that involves the same type of care or treatment" as that required of Alexander. Tex. Civ.
Prac. & Rem. Code Ann. § 74.402(b)(1). By finding Barrash unqualified to render expert
testimony as to the standard of care involved in laminectomies, the trial court abused its
discretion. 

 2. Barrash's Testimony is Reliable

 "Rule 702's reliability requirement focuses on the principles, research, and
methodology underlying an expert's conclusions." Exxon Pipeline Co. v. Zwahr, 88 S.W.3d
623, 629 (Tex. 2002). In reviewing the reliability of an expert's testimony, the court is not
to determine whether the expert's conclusions are correct but "whether the analysis used
to reach those conclusions is reliable." Id. Expert testimony involving scientific knowledge
that is not grounded "'in the methods and procedures of science' is no more than
'subjective belief or unsupported speculation.'" Robinson, 923 S.W.2d at 557 (quoting
Daubert, 509 U.S. at 590); see Merrell Dow Pharms, Inc. v. Havner, 953 S.W.2d 706, 711
(Tex. 1997) (noting that an expert's "bare opinions will not suffice" and the "substance of
the testimony must be considered"). Because there is nothing in the record to indicate the
test the trial court used when determining the reliability of Barrash's testimony, we look to
both the Robinson factors (3) and Gamill analytical gap analysis. (4) See Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 579-80 (Tex. 2006). 

 St. Clair contends that the foundational data underlying Barrash's opinion is reliable
because it is based on reliable scientific methodology. Differential diagnosis, the
methodology used by Barrash, is a scientific process whereby a doctor identifies the cause
of a medical problem by eliminating possible causes "by comparing the patient's symptoms
to symptoms associated with known diseases, conducting physical examinations, collecting
data on the patient's history and illness, and analyzing that data--until a final diagnosis for
proper treatment is reached." Coastal Tankships, U.S.A., Inc. v. Anderson, 87 S.W.3d
591, 604 (Tex. App.-Houston [1st Dist.] 2002, pet. denied). Generally, differential
diagnosis is performed after conducting physical examinations, taking medical histories,
and reviewing clinical tests. Praytor v. Ford Motor Co., 97 S.W.3d 237, 245 (Tex.
App.-Houston [14th Dist.] 2002, no pet.). Differential diagnosis then requires "determining
the possible causes for the patient's symptoms and then eliminating each of these potential
causes until reaching one that cannot be ruled out or determining which of those that
cannot be excluded is the most likely." Id. Differential diagnosis "'has widespread
acceptance in the medical community, has been subject to peer review, and does not
frequently lead to incorrect results.'" Id. (quoting Brown v. Se. Pa. Transp. Auth. (In re
Paoli R.R. Yard PCB Litig.), 35 F.3d 717, 758 (3d Cir. 1994)). 

 Barrash's affidavit sufficiently states the methodology he employed by listing the
most likely causes of cauda equina syndrome and using St. Clair's postoperative
radiographical studies to eliminate two of the potential causes. In his affidavit, Barrash
states that based on his education, experience, and training, and after reviewing and taking
into account St. Clair's medical history and treatment, there are three potential causes of
St. Clair's cauda equina syndrome: (1) over-manipulation of the cauda equina nerves; (2)
spinal stenosis; or (3) a postoperative hematoma. In conducting his investigation, Barrash
reviewed St. Clair's medical records, including but not limited to medical records of St.
Clair's previous surgeries, physical therapy records, records from Alexander, as well as
multiple x-ray, imaging, and radiographic studies. The postoperative radiological studies
negated the presence of spinal stenosis or a hematoma. (5) By negating two of the three
most likely causes, Barrash determined that over-manipulation of the cauda equina nerves
caused St. Clair's cauda equina syndrome.

 Alexander contends that he properly challenged Barrash's methodology by pointing
out that: (1) Barrash could not support his opinions with any medical record; (2) Barrash
could cite no medical literature to support his opinion; and (3) Barrash failed to address
alternative causes of cauda equine syndrome. We cannot agree. In his affidavit, Barrash
states that he reviewed St. Clair's medical records. Further, Barrash formulated his opinion
that over-manipulation of the cauda equina nerves caused St. Clair's injury by reviewing
her postoperative radiographic studies. 

 Alexander also argues that he properly challenged the methodology employed by
Barrash by arguing that Barrash failed to rule out other causes of St. Clair's cauda equina
syndrome. Specifically, Alexander contends that Barrash failed to address alternative
causes of cauda equine syndrome, such as fragments, degenerative changes, or
uncontrollable swelling; again, we cannot agree. 

 Alexander argues that both fragments and uncontrollable post-surgical swelling are
possible causes of cauda equina syndrome. In his deposition, Barrash dismisses the
likelihood of either being a cause:

Q. Have you ever read that retained disk fragments can contribute to
cauda equina syndrome?


A. Well, obviously, they can.


Q. Have you read it?


A. Not that I recall.


Q. Are you telling me that with a decompression you should never have
any type of swelling of the nerve roots?


A. I think that's a possibility.


Q. Is it a probability?


A. I think it's a possibility.


Q. But not a probability?


A. At what level? At what level are we talking about?


Q. At L3 to S1?


A. Probably it should be minimal; and if you're well decompressed, it
doesn't matter.


Q. Nevertheless, you can have swelling of the nerve roots with a
standardly performed decompression?


A. I guess that's a possibility.


Q. Okay. At what point in time? Immediately when you wake up, or
when swelling occurs 24 to 72 hours later?


A. You have to qualify that for me. At what point in time?


Q. All I can tell you is post-op.


A. Well, you have to qualify because the swelling doesn't come instantly
unless you bang a nerve. You've really got a bang a nerve. And if
you really bang a nerve, that's not right. You don't do that. If it comes
on 24 hours later--nerves take time to swell. The spinal cord takes
time to swell. 


 You decompress the cervical area that's been very tightly
compressed, and you can get a quadripareses from that, which is
reversible from the swelling which doesn't come on when you wake
up. It comes on 6, 8, 10, 12, 24, 48 hours later.


 Swelling in the nervous system reaches it [sic] its maximum in two to
days [sic], not in two to five minutes, unless there's a direct trauma to
the nerve, to the cauda equina, to multiple nerves.


In light of the foregoing, St. Clair met her burden of establishing that Barrash utilized a
scientifically reliable methodology. See Robinson, 923 S.W.2d at 557. We conclude
Barrash was qualified and his testimony was reliable. Thus, the trial court abused its
discretion by sustaining Alexander's objections to Barrash's expert opinion evidence. 
Accordingly, we sustain St. Clair's third issue as construed.

III. No-Evidence Summary Judgment


 In her first issue, St. Clair contends that the trial court erred by considering evidence
attached by Alexander to his no-evidence motion for summary judgment. In her second
issue, St. Clair contends that the trial court's consideration of the evidence attached to
Alexander's no-evidence motion for summary judgment converts the motion to a traditional
motion for summary judgment, and thereby changes the standard of review from legal
sufficiency to de novo. 

A. Standards of Review

 We review a trial court's ruling on a no-evidence motion for summary judgment for
legal sufficiency. Tamez, 206 S.W.3d at 581-82; King Ranch, Inc. v. Chapman, 118
S.W.3d 742, 750-51 (Tex.2003). Accordingly, we review the evidence in the light most
favorable to the non-movant, disregarding all contrary evidence and inferences. City of
Keller v. Wilson, 168 S.W.3d 802, 825 (Tex. 2005) (noting that review of a "no-evidence"
motion for summary judgment is effectively restricted to the evidence contrary to the
motion); Ortega v. City Nat'l Bank, 97 S.W.3d 765, 772 (Tex. App.-Corpus Christi 2003,
no pet.) (op. on rehr'g). The burden of producing evidence is entirely on the non-movant;
the movant has no burden to attach any evidence to the motion. See Tex. R. Civ. P.
166a(i). Summary judgment is improper if the non-movant produces evidence to raise a
genuine issue of material fact. See id. To raise a genuine issue of material fact, the non-movant must produce a scintilla of probative evidence. Ortega, 97 S.W.3d at 772. "Less
than a scintilla of evidence exists when the evidence is 'so weak as to do no more than
create a mere surmise or suspicion of a fact.'" Id. (quoting Kindred v. Con/Chem, Inc., 650
S.W.2d 61, 63 (Tex. 1983)). Conversely, more than a scintilla exists when the evidence
"rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions." Id. (citing Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994)). In
determining whether the non-movant has produced more than a scintilla of evidence, we
review the evidence in the light most favorable to the non-movant, crediting such evidence
if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors
could not. Tamez, 206 S.W.3d at 582; City of Keller, 168 S.W.3d at 827. 

 A traditional motion for summary judgment, on the other hand, is reviewed de novo. 
See Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003); Branton
v. Wood, 100 S.W.3d 645, 646 (Tex. App.-Corpus Christi 2003, no pet.) Upon review of
a traditional summary judgment, we must determine whether the movant met its burden
to establish that no genuine issue of material fact exists and that the movant is entitled to
judgment as a matter of law. Tex. R. Civ. P. 166a(c); Sw. Elec. Power Co. v. Grant, 73
S.W.3d 211, 215 (Tex. 2002); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d
671, 678 (Tex. 1979). The movant bears the burden of proving that there is no genuine
issue of material fact and that he is entitled to summary judgment at a matter of law. See
Sw. Elec. Power Co., 73 S.W.3d at 215. Any evidence favorable to the non-movant is
taken as true, and any doubts are resolved in the non-movant's favor. Valence Operating
Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).

B. Consideration Does Not Warrant Transformation

 In Binur v. Jacobo, the Texas Supreme Court held that a movant's attachment of
evidence to a single filing that combines a no-evidence motion for summary judgment with
a traditional motion for summary judgment does not foreclose the movant from advancing
no-evidence points. 135 S.W.3d 646, 651 (Tex. 2004). However, "if a motion brought
solely under subsection (i) attaches evidence, that evidence should not be considered
unless it creates a fact question, but such a motion should not be disregarded or treated
as a motion under subsection (a) or (b)." Id., see Tex. R. Civ. P. 166a(i) (regarding no-evidence motions for summary judgment); Tex. R. Civ. P. 166a(a), (b) (regarding traditional
motions for summary judgment). In the present case, neither party disputes that the
motion filed by Alexander is solely a no-evidence motion for summary judgment that raises
a Daubert-Robinson challenge. St. Clair argues that the trial court considered Alexander's
evidence by allowing Alexander to read aloud the evidence attached to his motion for
summary judgment. St Clair further argues that such consideration was erroneous and
transforms Alexander's no-evidence motion into a traditional motion.

 St. Clair supports her transformation argument by citing Breshears v. State Farm
Lloyds, an opinion decided by this Court three months after Binur. 155 S.W.3d 340 (Tex.
App.-Corpus Christi 2004, pet. denied). In Breshears, an insurance contract dispute arose
between Breshears and State Farm Lloyds. Id. at 341. Traditional motions for summary
judgment were filed by both parties, and State Farm also filed a no-evidence motion for
summary judgment. Id. The trial court granted State Farm's motion for summary judgment
without specifying whether the motion was granted on traditional or no-evidence grounds. 
We noted, "[b]ecause the trial court relied on evidence attached to the motions, we
consider the traditional motion for summary judgment only." Id. at 342. By so stating, we
did not hold that the no-evidence motion was converted into a traditional summary
judgment; we merely advocated looking to surrounding circumstances in determining
whether a traditional or no-evidence motion had been ruled upon. In Breshears, it was
unclear whether the traditional or no-evidence had been ruled upon; therefore, we simply
noted that, because we assume that the trial court knows not to consider evidence
produced by the movant when ruling on a no-evidence motion, by process of elimination,
the trial court must have ruled on the traditional motion. 

 The present case is distinguishable because it is clear that after sustaining
Alexander's objections to Barrash's testimony, the trial court granted Alexander's motion
for summary judgment on no-evidence grounds. Moreover, neither St. Clair nor Alexander
dispute that only a no-evidence motion for summary judgment was filed. Because we find
that the no-evidence motion for summary judgment has not been converted, we decline
to review this case under a de novo standard. Accordingly, we overrule St. Clair's second
issue.

C. Breach of the Standard of Care and Causation

 In her first issue, St. Clair contends that the trial court erred by considering the
portions of Barrash's testimony attached by Alexander. In order to prevail on her medical
malpractice claim, St. Clair must establish that: (1) Alexander had a duty to comply with
a specific standard of care; (2) Alexander breached that standard of care; (3) St. Clair was
injured; and (4) there was a causal connection between the breach of the standard of care
and the injury. See Williams v. Huber, 964 S.W.2d 84, 86 (Tex. App.-Houston 1997, no
pet.). We construe this as arguing that there is enough evidence in the record to survive
Alexander's motion for no-evidence summary judgment.

 Alexander's no-evidence motion for summary judgment asserts that he is "entitled
to summary judgment because there is no evidence of breach of the standard of care or
causation to support [St. Clair]'s causes of action." (6) Even assuming the trial court erred
in considering the evidence attached to Alexander's no-evidence motion for summary
judgment, we conclude that St. Clair produced more than a scintilla of evidence concerning
Alexander's breach of the standard of care and causation. 

 "In a negligence case, the applicable standard of care is a threshold issue that the
plaintiff must establish before the factfinder can determine if the defendant deviated from
the standard of care to a degree that constitutes negligence." Cobb v. Dallas Fort Worth
Med. Ctr., 48 S.W.3d 820, 825 (Tex.App.-Waco 2001, no pet.). In his affidavit, Barrash
states: 

The standard of care when performing a decompressive laminectomy
requires the surgeon to use proper technique and care of the nerves running
along the lumber [sic] area. Specifically, the surgeon must not aggressively
manipulate the nerves to the point that injury occurs. Because of the
delicate nature of the nerves in this area, over manipulation of the nerves by
the surgeon will lead to cauda equina syndrome . . . . If the nerves are
handled properly and within the standard of care; that is, they are not over
manipulated, a patient will not develop cauda equina syndrome in an
otherwise successful procedure.


Barrash's affidavit then asserts that Alexander failed to meet the standard of care by using
"excessive force to manipulate the nerves during the procedure." Such excessive force,
he asserts, was the direct cause of St. Clair's cauda equina syndrome. Barrash's affidavit
continues:

In Ms. St. Clair's procedure, cauda equina syndrome could not have
occurred absent negligence. A review of Ms. St. Clair's medical chart shows
no other possible causes for Ms. St. Clair's cauda equina syndrome other
than the over-manipulation of the cauda equina nerves during the procedure. 
The only other causes for Ms. St. Clair's cauda equina syndrome, given her
medical history and treatment, would have been the spinal stenosis itself or
a postoperative hematoma. No radiological studies taken postoperatively
show the presence of a hematoma. Further, Ms. St. Clair's radiographic
studies show that her spinal stenosis was relieved by the procedure. 
Therefore, in reasonable medical probability, Ms. St. Clair's cauda equina
syndrome could only have been caused by over manipulation of her cauda
equina nerves. This nerve injury, in turn, has caused Ms. St. Clair's severe
bowel and bladder dysfunction, sexual dysfunction, as well as her diminished
ability to use her left on the left side of her body.


 Based on the foregoing evidence, we conclude that reasonable minds could differ
as to whether Alexander manipulated St. Clair's nerves with excessive force; therefore, St.
Clair's first issue, as construed, is sustained. See Chapman, 118 S.W.3d at 751; Ortega,
97 S.W.3d at 772. 

IV. Conclusion


 We reverse the trial court's order granting Alexander's objections and summary
judgment and remand for further proceedings consistent with this opinion.



 

 ROGELIO VALDEZ,

 Chief Justice



Memorandum Opinion delivered and 

filed this the 30th day of September, 2009.

1. While some of the excerpts attached by St. Clair mirror those attached by Alexander, others do not. 
St. Clair attached pages 2-5, 54-77, and 110-112, while Alexander attached pages 18-25, 34-41, 46-49, 54-73,
78-93, and 102-109.
2. Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must
be qualified; (2) the proposed testimony must be scientific knowledge; and (3) the testimony must assist the
trier of fact to understand the evidence or to determine a fact in issue. See Tex. R. Evid. 702; E.I. du Pont
Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995).
3. In Robinson, the supreme court set forth a non-exclusive list of six factors for determining reliability
of expert testimony. Robinson, 923 S.W.2d 549 at 556. The factors include: (1) the extent to which the
theory has been or can be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4)
the technique's potential rate of error; (5) whether the underlying theory or technique has been generally
accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made
of the theory or technique. Id. 
4. When an expert opinion is based on the experience of the expert alone, the trial court must
determine if there is a sufficient connection between the existing data and the opinion offered or if there is
"simply too great an analytical gap" for the expert testimony to be considered reliable. Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex. 1998) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136,
146 (1997)).
5. The deposition of Barrash also indicates that spinal stenosis was not the cause of St. Clair's cauda
equina: 


Q. Were you able to tell from the postoperative films that the severe spinal stenosis had
been relieved? 


A. Apparently, it had. 


Q. All right. In other words the--the doctor went in to relieve a severe spinal stenosis
and, radiographically at least, apparently he did? 


A. Apparently, the severe stenosis was relieved.
6. Specifically, Alexander argues that Barrash's testimony is contradictory because: (1) "[a]t his
deposition, Barrash admitted that he could identify no act during the surgery which violated the standard of
care. However, in his affidavit, he asserts that Alexander used excessive force during the operation"; and (2)
Barrash admitted in his deposition that there are several possible causes of cauda equina syndrome, but his
affidavit lists only three. During his deposition, Barrash was asked if he could point to a page in St. Clair's
operative or other medical record and "say this was a wrong thing to do." However, Barrash later testified that
cauda equina syndrome would not occur unless a surgeon "really bang[s] a nerve," and that "if you really bang
a nerve, that's not right." Moreover, although Barrash testified that there are several "possible" causes of
cauda equina syndrome, his affidavit specifically states that "given [St. Clair's] medical history and treatment,"
there are only three possible causes. We therefore conclude that Alexander's assertion that Barrash's
testimony is contradictory is unfounded.